**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
_____
MT HOLLY CITIZENS IN ACTION,    :
INC., et al.,                   :
                                :       Civil Action No.
              Plaintiffs,       :       08-2584 (NLH)(JS)
                                :
          v.                    :
                                :
TOWNSHIP OF MOUNT HOLLY,        :
et al.,                         :       OPINION
                                :
              Defendants.       :
_____ :
```

**Appearances:**

DOUGLAS E. GERSHUNY, EXEC. DIR.
OLGA D. POMAR
DAVID M. PODELL
SOUTH JERSEY LEGAL SERVICES, INC.
745 MARKET STREET
CAMDEN, NJ 08102
*Attorneys for Plaintiffs*

R. WILLIAM POTTER
POTTER & DICKSON
194 NASSAU STREET
PRINCETON, NJ 08542
*Attorney for Plaintiffs*

SUSAN ANN SILVERSTEIN
AARP FOUNDATION LITIGATION
601 E STREET, NW
WASHINGTON, DC 20049
*Attorney for Plaintiffs*

GAETANO MERCOGLIANO
SWEENEY & SHEEHAN
216 HADDON AVENUE, SUITE 500
WESTMONT, NJ 08108
*Attorney for Defendant Triad Associates, Inc.*

M. JAMES MALEY
MALEY & ASSOCIATES

931 HADDON AVENUE
COLLINGSWOOD, NJ 08108
*Attorney for Defendant Mount Holly Township, et al.*

WILLIAM J. DESANTIS
BALLARD SPAHR ANDREWS & INGERSOLL LLP
PLAZA 1000 - SUITE 500
MAIN STREET
VOORHEES, NJ 08043
*Attorney for Defendant Keating Urban Partners, L.L.C.*

**HILLMAN, District Judge**

This case involves the redevelopment of the Mount Holly Gardens neighborhood (the "Gardens") in Mount Holly, New Jersey. Plaintiffs are low-income, African-American, Hispanic and "white" residents of the Gardens, who object to the plan because they claim they are being forcibly removed from their homes, which are being replaced in large part with new, much higher-priced market rate homes.

Currently before this Court are defendants' motions for summary judgment, which had been converted from motions to dismiss on four of plaintiffs' claims.[1] The Court provided the plaintiffs with additional time to respond to the converted motions, and then allowed defendants to file reply briefs. The supplemental briefing is completed, and the remaining claims that

_____

[1] The other five counts were dismissed. Since this case was filed over two years ago, it has been extensively litigated with several hearings, the denial of a TRO and preliminary injunction, the filing of a second amended complaint, and the issuance of numerous written Opinions. Litigation over the Gardens redevelopment also precedes this case in New Jersey state court. Overall, the concerns of several Gardens residents have caused the dispute over the blighted neighborhood's redevelopment plan to spend ten years in the courts.

2

are now ready for final resolution are plaintiffs' claims for violations of Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act or FHA), 42 U.S.C. § 3601 et seq. (Count One against all defendants); the Civil Rights Act of 1866, 42 U.S.C. § 1982 (Count Two against the Township); the Equal Protection Clause of the U.S. Constitution, brought pursuant to 42 U.S.C. § 1983 (Count Three against the Township); and Equal Protection Clause of the New Jersey State Constitution (Count Five against the Township), as well a claim for punitive damages.

As this Court previously expressed on several occasions, we recognize that the Gardens redevelopment has had an effect on low-income families, and, correspondingly, minority families. The Court also recognizes that being forced from one's home is a difficult and emotional issue, compounded by the fear of being unable to afford a comparable place to live.  However, as the Court has also expressed previously, plaintiffs have failed to demonstrate that the Township, or the entities assisting the Township in the redevelopment and relocation services, has implemented a plan that has a disparate impact on the Gardens residents as the law defines it.  Nor have they shown that the defendants have not been proceeding pursuant to a legitimate governmental interest in the least restrictive way, or have otherwise acted with discriminatory intent.  Consequently, as explained more fully below, defendants' motions will be granted,

and the case will be closed.

## DISCUSSION[2]

### A.    Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

---

[2] Because the background and procedural history have been laid out in the Court's previous Opinions, they will not be restated here.

4

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Analysis**

  **1.   Count One - Fair Housing Act**

This Court has already analyzed plaintiffs' Fair Housing Act claim substantively in the context of plaintiffs' motion for a preliminary injunction.  That analysis was adopted in the Court's most recent Opinion, which converted defendants' motions to dismiss into ones for summary judgment.  That analysis found that plaintiffs had not demonstrated that the redevelopment has had a disparate impact on a protected group, or that defendants did not have a legitimate interest in the redevelopment, or that no alternative course of action would have a lesser impact.  Recognizing that plaintiffs' Fair Housing Act claim had only been

considered in the context of a preliminary injunction, the Court afforded plaintiffs time to gather specific facts to show a genuine issue for trial on these issues.  The Court now affirms its prior decision on plaintiffs' FHA claim because plaintiffs have not provided the requisite proof to take the issues to a jury.

As a preliminary matter, plaintiffs argue that they should be afforded time for discovery, and are prejudiced in their ability to oppose the converted motions because of the lack of discovery.  Plaintiffs contend that they require a look into the defendants' state of mind and intentions, as well as documents that are only within the control of defendants and, thus, unavailable to plaintiffs.  Without this information, plaintiffs argue that summary judgment is premature, which is further evidenced by the fact that defendants have not even filed their answers to plaintiffs' complaint.

Although the Court recognizes the peculiar procedural history that has led to the resolution of summary judgment motions without the filing of answers or the undertaking of formal discovery, this is not a case where plaintiffs are neophytes filing an initial challenge to the Gardens redevelopment plan.  Not only has there been extensive proceedings over two years in this Court, most of these issues have been thoroughly litigated in New Jersey state court over the

course of several years preceding this case.[3]  As pointed out by defendants, plaintiffs have already had the ability to obtain the information they seek through Open Public Records Act requests, as well as through the previous state court litigation.  Further, much of the information is available by other means, including from the residents themselves or the Public Advocate, who undertook an investigation of the Township's relocation practices.[4]

Moreover, plaintiffs do not specifically identify what information defendants hold to support their claims, and instead request discovery generally, such as depositions of key officials in order to acquire testimony as to their intent to "rid [the Township] of a minority community."  (Pomar Cert., Docket No. 106-41) ("Residents are severely prejudiced by being unable to probe, at a deposition, the attitudes, intent, and motives of the Township officials who made the critical decisions to pursue the Gardens redevelopment project.").  Discovery, however, cannot serve as a fishing expedition through which plaintiffs search for

---

[3] The Court recognizes that the state court case was more narrow than this one, and the civil rights claims had been dismissed as unripe, but none of the discovery plaintiffs contend they need here to supplement the discovery from the state court litigation would save their otherwise deficient claims.

[4] In the Court's February 13, 2009 Opinion, the Court considered and referenced the Public Advocate's report, which was provided by plaintiffs pursuant to the Court's November 25, 2008 Order granting plaintiffs' request to supplement the record with the report.

evidence to support conclusory speculations.  Giovanelli v. D. Simmons General Contracting, 2010 WL 988544, *5 (D.N.J. 2010). Further, such depositions may be barred by a privilege afforded to decision-making government officials.  See, e.g., U.S. v. Sensient Colors, Inc., 649 F. Supp. 2d 309, 316 (D.N.J. 2009).[5]

---

[5] Indeed, in addressing the same argument by plaintiffs in the earlier state court litigation, Judge Sweeney explained,

> There are many reasons why discovery is the exception rather than the rule in actions such as this one.  First, a public official's state of mind is rarely an issue and can usually be determined from the record below. There are transcripts, tapes, minutes and the like.  Secondly, and no less important, is the consideration that members of the municipal governing bodies and local boards serve without significant remuneration.  They would be far less likely to serve if their official actions frequently subjected them to the arduous discovery process. Interrogatories would have to be answered and depositions attended after usual hours of public service.  It would place a chilling effect on public service.

> Here, I am convinced that the discovery sought would burden the officials involved to a degree that would be totally disproportionate to any usable information that could be recovered.  Furthermore, there has already been one hearing in this matter. Although I limited plaintiffs to two expert witnesses, I also afforded them the right to call township officials to testify.  They elected, for whatever reason, not to do so. Following that hearing, I determined that the designation of the Gardens as an area in need of redevelopment had substantial credible support in the record, was a designation made in accordance with statutory criteria, and I found no evidence of racial or ethnic bias or animus in the testimony of . . . the town

Overriding all these points with specific reference to plaintiffs' FHA claim, however, is that in order to prove their claim, none of the discovery plaintiffs claim they lack would save their allegations, as plaintiffs must present their own proof of disparate impact and a more-viable alternative.  Stated several times before, Section 3604(a) of the Fair Housing Act makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a) (emphasis added).  The FHA can be violated by either intentional discrimination or if a practice has a disparate impact on a protected class.  Community Services, Inc. v. Wind Gap Mun. Authority, 421 F.3d 170, 176 (3d Cir. 2005).

Plaintiffs here contend that the Gardens redevelopment plan has a disparate impact on the minorities living in the Gardens. In order to prove their claim, plaintiffs must first establish a prima facie case of disparate impact.  Resident Advisory Board v. Rizzo, 564 F.2d 126, 148 (3d Cir. 1977).  To show disparate impact, plaintiffs must show that the Township's actions have had

planner.

 (August 30, 2005 Opinion, L-3027-03, at 6-7, Def. Ex. A, Docket No. 84-3.)

a greater adverse impact on the protected groups (here, African-Americans and Hispanics) than on others.  <u>Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains</u>, 284 F.3d 442, 466-67 (3d Cir. 2002).

If a plaintiff establishes his prima facie case, the burden shifts to the defendant to demonstrate justification.  The "justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no other alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact."  <u>Rizzo</u>, 564 F.2d at 149.  Finally, "[i]f the defendant does introduce evidence that no such alternative course of action can be adopted, the burden will once again shift to the Plaintiff to demonstrate that other practices are available."  <u>Id.</u> at 149 n.37.  "If the Title VIII prima facie case is not rebutted, a violation is proved."  <u>Id.</u> at 149.

Thus, it is plaintiffs' burden to show disparate impact, and if they do, it is their burden to rebut the Township's position[6] and demonstrate a more-viable alternative course of action.  Plaintiffs have done neither.

To support disparate impact, plaintiffs argue that the

_____

[6] In the October 23, 2009 Opinion, the Court found that the Township had already met its burden based on the record before the Court at that time.  As explained more fully herein, plaintiffs' supplemental briefing does not demonstrate a material issue of fact regarding the Township's legitimate interest and alternative choices.

redevelopment more negatively affects minorities in Mt. Holly
than non-minority residents because the redevelopment is driving
out the minority population of Mt. Holly.  Plaintiffs also argue
that the redevelopment plan has a disparate impact on minorities
because the plan is targeted at an area that is populated by
mostly minorities.  To support their position, plaintiffs had
previously presented a report of a demographic and statistical
expert, Andrew A. Beveridge, Ph.D.  Dr. Beveridge opined that the
redevelopment of the Gardens effectively and significantly
reduces the minority population in Mt. Holly.

     The Court had rejected that proof.  The Court explained,

          Even though plaintiffs have pointed out that the
     redevelopment of the Gardens has reduced the minority
     population of Mt. Holly, they have not accounted for
     how many minorities will move into the new housing.
     Furthermore, and more importantly for the plaintiffs'
     FHA claim of disparate impact, the redevelopment plan
     does not apply differently to minorities than non-
     minorities.  Several plaintiffs classify themselves as
     "white," yet the plan affects them in the exact same
     way as their minority neighbors.  The real effect of
     the Gardens redevelopment is that there will be less
     lower-income housing in Mt. Holly.  Although the
     Township may have some obligation with regard to
     providing a certain number of low-income housing
     pursuant to other law, the reduction of low-income
     housing is not a violation of the FHA.  The FHA
     prohibits the Township from making unavailable a
     dwelling to any person because of race--it does not
     speak to income.  Redevelopment of blighted, low-income
     housing is not, without more, a violation of the FHA.
     Here, where fourteen homes are occupied by African-
     American plaintiffs, thirteen homes are occupied by
     Hispanic plaintiffs, and six homes are occupied by
     "white" plaintiffs, and all are affected in the same
     way by the redevelopment, the Court cannot find, on the
     current record at this preliminary injunction stage,

11

that plaintiffs will succeed on their disparate impact
FHA claim.

(Feb. 13, 2009 Op. at 7-8.)

In their opposition to the converted motions, plaintiffs

present the same statistics, and further argue that there is

disparate impact on minorities because the displaced plaintiffs

will not be able to afford the new $200,000+ homes, or the $1,300

to rent these same properties.[7]  As explained before, however, if

none of the plaintiffs can afford the new homes, it is not just

the African-American and Hispanic plaintiffs who are impacted by

the increased housing prices--it is all Gardens residents,

including the Caucasian residents.[8]  Additionally, as also

explained before, plaintiffs have not demonstrated that the

Township is preventing minorities from purchasing or moving into

the new homes, or otherwise limiting the new residents to non-

minorities.  Plaintiffs have not provided any proof or statistics

to suggest that the new homes created by the redevelopment will

be financially out-of-reach for all or most minorities.[9]

---

[7] Although 464 units will be market rate, 56 will be deed-
restricted affordable housing units.

[8] Relatedly, plaintiffs argue that because a greater
percentage of minority Township residents have been affected by
the redevelopment they have demonstrated a disparate impact.
Even if this statistic was sufficient to establish a prima facie
case, plaintiffs' FHA claim fails for reasons other than the
disparate impact analysis.

[9] Plaintiffs present statistics that only 21% of African-
American and Hispanic households in Burlington County would be

12

Furthermore, under plaintiffs' logic, any action by the
Township to do anything with regard to the Gardens would result
in a disparate impact, simply because of the racial composition
of the Gardens.  The FHA (or any other civil rights law) does not
contemplate that a town will never be permitted to ameliorate a
blighted area inhabited mainly by minorities simply because it
will affect minorities.  See, e.g., City of Memphis v. Greene,
451 U.S. 100, 128 (1981) ("Because urban neighborhoods are so
frequently characterized by a common ethnic or racial heritage, a
regulation's adverse impact on a particular neighborhood will
often have a disparate effect on an identifiable ethnic or racial
group.  To regard an inevitable consequence of that kind as a
form of stigma so severe as to violate the Thirteenth Amendment

---

able to afford the new houses, because that percentage of
African-American and Hispanic population earns above 80% of the
median income ($44,580).  (Bev. Cert., Ex. B-2, Docket No. 106-
4.)  This is in contrast to 79% of white Burlington County
residents who earn above 80% of the median income.  (Id.)  These
statistics hold little validity to show a disparate impact on the
Township's minority population for several reasons: (1) they take
into account the entire population of Burlington County, rather
than only Mt. Holly Township, and the towns in Burlington County
are of various economic and racial compositions; (2) they do not
account for minorities who will move into Mt. Holly Township from
outside Burlington County; (3) they do not account for the deed
restricted units that will be more affordable; (4) they do not
account for a non-minority purchaser who rents to a minority;
(5) they do not account for the minorities who will move
elsewhere within Mt. Holly Township; and (6) more recent
population survey data (from 2008, compared to the 2000 Census
data used by plaintiffs' expert) shows 16,744 African-American
and Hispanic households in Burlington County have incomes
exceeding $45,000, evidence of the minority population's ability
to occupy all 464 market rate homes.

would trivialize the great purpose of that charter of freedom.").

Finally, it is important to point out that none of the plaintiffs has been forced out of their homes by the Township without the offer of relocation services.  The FHA makes it unlawful to otherwise make unavailable or deny a dwelling to any person because of race.  The Township has advised the residents not to move until directed by the Township so that they will be eligible for relocation assistance.  All plaintiffs, save for one who was told to leave by her landlord, are still residing in the Gardens.  Thus, on this basis alone, plaintiffs' FHA claim fails.

But even if plaintiffs were able to establish their prima facie case, they have not rebutted the Township's legitimate interest in the redevelopment, and they have not shown how an alternative course of action would have a lesser impact. Plaintiffs cannot refute that redevelopment of the community to remove blight conditions is a bona fide interest of the state, as explained previously by this Court and by the New Jersey Appellate Division.  (See Feb. 13, 2009 Op. at 9, citing Wilson v. City of Long Branch, 142 A.2d 837, 842 (N.J. 1958) ("Community redevelopment is a modern facet of municipal government.  Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth.  It provides the means of removing the decadent effect of slums and blight on neighboring property values, of opening up new areas

14

for residence and industry."); <u>Citizens In Action v. Township Of
Mt. Holly</u>, 2007 WL 1930457, *13 (N.J. Super. Ct. App. Div. July
5, 2007) (finding that "[t]he dilapidated, overcrowded, poorly
designed community [the Gardens], in addition to the high level
of crime in the area, is clearly detrimental to the safety,
health, morals and welfare of the community").)  It is clear that
the Township has a legitimate interest in the redevelopment of
the Gardens.

    With regard to alternatives, plaintiffs have not identified
disputed issues of fact concerning whether the Township failed to
show "that no alternative course of action could be adopted that
would enable that interest to be served with less discriminatory
impact." <u>Rizzo</u>, 564 F.2d at 149.  The adequacy of the
redevelopment plan, as opposed the rehabilitation plan advocated
by Plaintiffs, was extensively analyzed in New Jersey state
court.  <u>See</u> <u>Citizens In Action v. Township Of Mt. Holly</u>, 2007 WL
1930457, 14 (N.J. Super. Ct. App. Div. 2007) (finding that "the
redevelopment designation is based on a record that provides
substantial evidence in support of the determination").[10]

---

[10]Even though that analysis was performed in the context of
plaintiffs' claims under New Jersey's Local Housing and
Redevelopment Law, N.J.S.A. 40A:12A-1 to -73 (LHRL), the issue of
the sufficiency of the 2005 redevelopment plan was extensively
litigated.  Thus, collateral estoppel principles may also apply.
<u>See</u> <u>In re Graham</u>, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations
omitted) (explaining that issue preclusion applies when "(1) the
issue sought to be precluded is the same as that involved in the
prior action; (2) that issue was actually litigated; (3) it was
determined by a final and valid judgment; and (4) the

Plaintiffs have not presented any plan more viable than the one implemented by the Township.[11]  They advocate rehabilitation, but have proposed a plan, as pointed out by defendants, that relies upon governmental subsidies and upon costs based on property conditions in 1989.  It also does not take into account rehabilitation costs to rehab owner-occupied homes, which is an additional $2.5 million, and it does not account for temporary

_____

determination was essential to the prior judgment").  The Court, however, refrains from considering this issue because plaintiffs' FHA claim, which also concerns the 2008 revised redevelopment plan, was not litigated in state court.

[11] The Township has shown that several organizations have attempted to rehabilitate the Gardens in the last 15 or so years. These small scale efforts were ineffective in curing the overall blight of the community, which was a frustrating result for the organizations, the Township, and the residents.  (See Sept. 8, 2003 Town Council meeting transcript at 25-26, 31-32, Def. Ex. B.). Plaintiffs argue that it is not their burden to prove a better alternative.  Although it is true that the Township must show the other alternatives they considered and rejected, and that the alternative course of action could not "be adopted that would enable that interest to be served with less discriminatory impact," once that showing is made, the ultimate burden "once again shift[s] to the Plaintiff to demonstrate that other practices are available."  Rizzo, 564 F.2d at 149.  Thus, plaintiffs in this case have the obligation to show what alternatives would have better served the community.  Of course, this analysis was intended to be performed after a finding of disparate impact, which causes this "alternative course of action" analysis to make more sense in that context--that is, if disparate impact is shown, the Township has the burden of showing it had no choice but to proceed in its chosen path despite the disparate impact.  Here, where no disparate impact has been shown, this analysis devolves into plaintiffs' personal disagreement with the plan, and an argument as to what they believe to be the best course of action.  The fact that the Township did not follow a plan sanctioned by the plaintiffs is not the standard for a FHA claim.

16

relocation costs.[12]   Simply because the properties could have

been rehabilitated does not mean that rehabilitation was the

feasible option.[13]

_____

[12] Plaintiffs' residential planning expert, Gary Smith, AIA, AICP, relates in his updated certification that the Township is violating several building codes in its demolition process.  The legality of how the Township is currently proceeding under its redevelopment plan is not before the Court.  Mr. Smith also opines that the redevelopment plan should be halted, and redirected to save the existing housing stock for rehabilitation. As the Court commented before, however, "[e]ffectively, plaintiffs are seeking to remain living in the blighted and unsafe conditions until they are awarded money damages for their claims and sufficient compensation to secure housing in the local housing market.  Although couched at times like an effort to have the development go up around them, like a highway built around a protected tree, or to have their units rehabilitated, this makes little if no practical sense after years of litigation, approved redevelopment plans, and the expenditure of significant public resources.  At this late stage, the only real practical remedy is for plaintiffs to receive the fair value for their home as well as proper and non-discriminatory relocation procedures and benefits. . . . The relief they are seeking is inconsistent with proving the fourth element of their FHA claim--namely, that an alternative course of action to eminent domain and relocation is viable."  (Feb. 9, 2009 Op. at 10-11.)

[13] The state appellate court commented,

> Photographic evidence reveals areas within
> the Gardens that are dilapidated.
> Additionally, there was testimony that there
> was overcrowding and excessive land coverage
> because of the way the units were arranged in
> blocks in fee simple ownership. Accordingly,
> a dilapidated home on one lot had a serious
> effect on homes on either side of it.
> Excessive land coverage was also evident
> where a majority of the rear yards were paved
> or covered with gravel to accommodate
> additional parking spaces. Finally, the
> alleyways created a faulty arrangement or
> design for the Gardens because it increased
> the amount of crime in the area. The
> dilapidated, overcrowded, poorly designed

In short, Plaintiffs have failed to show an impermissible disparate impact.  Even if they have made such a showing, they have failed to offer sufficient evidence to rebut the Township's legitimate governmental purpose or demonstrate illegitimate discriminatory intent.  Therefore, plaintiffs have not demonstrated that material disputed facts exist as to their FHA claim.  Accordingly, summary judgment must be entered in favor of defendants on this claim.[14]

### 2. Counts Two, Three, Five - Civil Rights Act and State and Federal Equal Protection Clause

Plaintiffs claim that the Township violated the Civil Rights Act of 1866, 42 U.S.C. § 1982, the Equal Protection Clause of the U.S. Constitution, brought pursuant to 42 U.S.C. § 1983, and the Equal Protection Clause of the New Jersey State Constitution.  In

---

community, in addition to the high level of crime in the area, is clearly detrimental to the safety, health, morals and welfare of the community.

Citizens In Action v. Township of Mt. Holly,  2007 WL 1930457, *13 (N.J. Super. Ct. App. Div. 2007).

[14] Plaintiffs' FHA claim was lodged against all defendants, including the construction company selected to undertake the redevelopment, Keating Urban Partners, LLC, and the company hired by Keating to conduct the relocation activities, Triad Associates, Inc.  In their previous motion to dismiss, Triad argued, and Keating joined in that argument, that it cannot be held liable under the FHA because it had no part in the drafting and adoption of the Township's redevelopment plan, and its actions with regard to the relocation activities do not fall within the province of the FHA-protected conduct.  Because the Court has found no FHA violation, Triad's argument will not be considered.

order to prove such claims, plaintiffs must show that they were
the target of intentional, purposeful discrimination by the
Township.  City of Cuyahoga Falls, Ohio v. Buckeye Community Hope
Foundation, 538 U.S. 188, 194 (2003) (citation omitted) ("'Proof
of racially discriminatory intent or purpose is required' to show
a violation of the Equal Protection Clause."); Bradley v. U.S.,
299 F.3d 197, 205 (3d Cir. 2002) (stating that in order to
establish a claim under the Equal Protection Clause, a plaintiff
needs to prove that the actions (1) had a discriminatory effect
and (2) were motivated by a discriminatory purpose); Brown v.
Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001) (citations
and quotations omitted) ("In order to bring an action under §
1982, a plaintiff must allege with specificity facts sufficient
to show or raise a plausible inference of (1) the defendant's
racial animus; (2) intentional discrimination; and (3) that the
defendant deprived plaintiff of his rights because of race.");
Greenberg v. Kimmelman, 494 A.2d 294, 308 (N.J. 1985) (stating
that if a law is facially neutral, "an equal protection claim
could succeed only if the statute had an invidious purpose").

Plaintiffs claim that through the redevelopment plan the
Township is intentionally seeking to deprive plaintiffs and other
African-Americans and Hispanics of the right to property and
equal protection under the law.  In the Court's prior Opinion
denying plaintiffs' request for preliminary injunction, the Court

19

found that plaintiffs did not demonstrate that the Township "implemented the development plan to intentionally or effectively drive out the minority population of Mt. Holly." (Feb. 9, 2009 Op. at 7.) Thus, as with their FHA claim, the Township's motion to dismiss these claims was converted to one for summary judgment, and the Court afforded plaintiffs the opportunity to provide other proof to support their claims of intentional discrimination.

    In their response, plaintiffs have failed to provide such proof. As discussed above, plaintiffs first argue that summary judgment is premature, because their ability to prove these intentional discrimination claims is thwarted by the lack of discovery--namely, the depositions of Township officials. As also discussed above, however, even if such depositions were permitted, the Court doubts that any Township official will testify to his or her "discriminatory purpose" in approving the redevelopment plan. See, e.g., Smith v. Town of Clarkton, N.C., 682 F.2d 1055, 1064-65 (4th Cir. 1982) (in an FHA case, stating, "Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public

20

record.  It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this.").

With regard to other methods for proving discriminatory intent, plaintiffs have had years to gather such proof, including obtaining affidavits from Gardens residents or other people who have been involved in the Gardens redevelopment process. Instead, plaintiffs' brief details the Township's alleged discriminatory actions, but none of the claims are supported by any documentary or other evidence.[15]  Rather, plaintiffs tell a

---

[15] Several affidavits by plaintiffs were submitted in support of their motion for preliminary injunction.  In their brief, plaintiffs specifically refer to one of them by Santos Cruz to support the claim that the Township's redevelopment activities lowered the property values of the remaining homes, and the Township took advantage of that situation by pressuring residents to sell their homes at deflated prices that did not represent fair market value.  (Pl. Opp. at 31.)  This conclusion is based on Mr. Cruz's "belief."  (Cruz Cert., Docket No. 17-9 ("I believe the houses are worth much more than the Township is offering.") The other affidavits by plaintiffs in the record contain similar statements as to their "beliefs" and "feelings."  See Ancho Cert., Docket No. 17-7, ¶ 18, "I believe that my home is worth much more than that [$39,000 to $42,000 offered to others] because we invested a great amount of money to make it comfortable for our retirement"); Simons Cert., Docket No. 17-10, ¶ 14, "I believe my house is worth a great deal more than what the Township is offering me," because it has three bedrooms, a large lot, and it has undergone "costly upgrades.") These affidavits are insufficient to defeat a summary judgment motion. Celotex, 477 U.S. at 332 ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment. Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact.").

21

story, long on accusations and suppositions but short on proof, of the Township's ten-year, insidious desire to displace the minority population of Mt. Holly.  If there were merit to these claims, plaintiffs would be able to annotate their allegations with factual evidence that would infer such discriminatory motive.[16]  They have not done so.  See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-67 (1977) (explaining that the determination as to "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and identifying objective factors that may be probative of racially discriminatory intent: (1) the racial impact of an official action; (2) the historical

---

Incidentally, these affidavits relate the plaintiffs' extensive participation in numerous meetings with the Township and the builders over the years.

[16] For example, plaintiffs state that "the Township failed to provide adequate compensation and relocation assistance to enable residents to purchase a replacement house in the Township or surrounding region."  (Pl. Opp. at 38.)  In the Court's prior Opinion, however, the Court noted, "The evidence on the record shows that other Garden residents whose homes have been acquired by the Township and have been relocated are pleased with both their compensation and place of relocation.  In fact, the evidence demonstrates that many residents now have significantly improved living conditions and are in better circumstances financially.  Additionally, the defendants represent, and plaintiffs do not dispute, that none of the people who have been relocated and wanted to remain in Mt. Holly were unable to."  (Feb. 9, 2009 Op. at 12 n.5.) Moreover, it is an undisputed fact that New Jersey statute only requires the Township to pay $4,000 in relocation benefits to tenants, and $15,000 in relocation benefits to homeowners, but the Township has paid $7,500 to tenants and $35,000 to homeowners.  (See Def. Statement of Facts, ¶ 23, at 31.)

background of the decision; (3) the sequence of events leading up to the challenged decision, including departures from normal procedures and usual substantive norms; and (4) the legislative or administrative history of the decision).

In contrast, the Township provides transcripts of town council and planning board meetings, where concerned citizens and council members discussed the plans for the Gardens.  The Township has also provided letters and affidavits from former Gardens residents, as well as certifications from individuals involved with the redevelopment plan implementation and relocation process.  These documents range in date from 2002 through early 2010.  The documents show that from the very beginning, the planning board was aware of the sensitive issues that would arise as they undertook the process, the desire to have direct communication with Gardens' residents, and the Township's consideration of the residents' concerns.  (See, e.g., Sept. 8, 2003 Town Council meeting transcript at 36-44, Def Ex. B.)  Although many viewpoints were expressed by the Gardens' residents and community activists, with some being supportive and hopeful, while other disenfranchised residents speaking emphatically and eloquently on their negative opinion on the redevelopment plan, their input was welcomed and encouraged.[17]

---

[17] Plaintiffs refer to the Township's "secret," off-the-record meetings among Township officials and the redevelopers where decisions were made without input from the community, and where they presume the true discriminatory intent of the Township

23

Furthermore, nowhere in plaintiffs' recitation of the Township's motives do plaintiffs specifically acknowledge the extensive deterioration, crime, and overall unsafe living conditions the Township was endeavoring to cure.  Although plaintiffs feel that the Township simply wishes to remove all minorities from the town, evidence in the record supports an opposing viewpoint--that but-for the significant concern for the Gardens' resident's welfare, and the desire to make the Township as a whole a safe and pleasant town for all of its citizens, minority and non-minority, the Township would have never undertaken the long-overdue project, particularly considering the challenges that the redevelopment would, and did, inspire.[18] Additionally, as noted above and previously, evidence in the record shows that many relocated residents have been pleased with

---

was revealed.  Although "New Jersey has a strong, expressed public policy in favor of open government, as evidenced by our Open Public Meetings Act, N.J.S.A. 10:4-6 to -21," Times of Trenton Pub. Corp. v. Lafayette Yard Community Development Corp., 874 A.2d 1064, 1070 (N.J. 2005) (citation omitted), the OPMA sets forth specific instances where closed-door sessions are appropriate, see N.J.S.A. 10:4-12, -13.  It is unclear whether these alleged "secret" meetings met the requirements of New Jersey's OPMA.  The Township's compliance with OPMA is not before the Court, however, and plaintiffs' allegations concerning these meetings as evidence of discriminatory intent are speculative, and, therefore, of insufficient weight to defeat summary judgment.

[18] It seems that plaintiffs could not dispute the ironic observation that if the Township had allowed the Gardens to continue to deteriorate as it had over the years, that it might then be fairly characterized as having a discriminatory intent toward its minority, low-income residents.

the process, and are now in a much better place as a result.

It also cannot be forgotten that the redevelopment plan has gone through three machinations, from the Gardens Area Redevelopment Plan ("GARP") in 2003, to the West Rancocas Redevelopment Plan ("WRRP") in 2005, and then to the Revised West Rancocas Redevelopment Plan in September 2008.  For each of these plans, the Township Council and the builder heard extensive public comment, testimony, and written objections (as intricately detailed in plaintiffs' complaint), and even though the 2005 WRRP was approved by the New Jersey Department of Community Affairs and affirmed by the New Jersey state trial and appellate courts, the Township and redevelopers conducted a reevaluation of the plan which resulted in the 2008 Revised WRRP. Despite plaintiffs' claims that all the plans were adopted without meaningful consideration of the residents' objections, it seems specious to believe that the Township extensively reevaluated and revised its plans while entertaining numerous opportunities for public comment and objection simply as a ruse to mask its ultimate purpose of "ridding" Mt. Holly of its minority population.

The Court acknowledges that for every governmental action, people will object, for personal reasons, or as a champion for those who cannot speak out for themselves.  The Court also acknowledges that governing officials are often not the most

25

efficient or pragmatic in their decision-making process. When people's homes are at stake, and when issues concerning race and economic status are involved, the emotions of everyone are amplified. This is evidenced not only by the 10-year litigation concerning the Gardens' redevelopment, but by the voices of the residents who have expressed the extremes of satisfaction and displeasure with the plan. In addition to the people who feel benefitted by the Township, it is undisputable that people have felt unjustifiably wronged by the Township, which has had to make some hard decisions along the way.

The Court, however, must view the case under the legal framework that constrains this Court's consideration of these issues, rather than under the emotional contours of the situation. At this summary judgment stage in the context of what proof has been provided, and in deciding what material issues of fact need to be resolved, the weight of the record evidence demonstrates that no reasonable juror could find that the Township acted with intentional discrimination in the development and implementation of the Gardens' redevelopment plan. Moreover, no additional discovery appears calculated or even remotely likely to provide the missing proofs. Consequently, summary judgment must be entered in favor of the Township on plaintiffs' intentional discrimination claims.

### 3. Punitive damage claims

Plaintiffs are also seeking punitive damages for all of their claims. The Township had moved to dismiss plaintiffs' request for punitive damages, arguing that under various legal principles, punitive damages cannot be imposed against a municipality. In the Court's previous Opinion, all of plaintiffs' punitive damages requests were dismissed, except for those relating to plaintiffs' FHA and Civil Rights Act claims (Counts One and Two). The Court reserved decision on these two claims pending consideration of the converted motions.

Even though "punitive damages can be awarded in a civil rights case where a jury finds a constitutional violation, even when the jury has not awarded compensatory or nominal damages," Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000) (citing Curtis v. Loether, 415 U.S. 189 (1974)) (both discussing FHA claims), a finding of a violation is a mandatory prerequisite to any possibility of punitive damages. Because the Court has not found defendants to be liable for plaintiffs' FHA and civil rights claims, plaintiffs' punitive damages claims fail as well.[19]

---

[19]For punitive damages, plaintiffs would also need to prove that defendants' "'conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). Plaintiffs cannot make this showing.

## <u>CONCLUSION</u>

For the reasons expressed above, defendants' converted motions for summary judgment shall be granted on the four remaining claims in plaintiffs' complaint.  An appropriate Order will be entered.


Date: January 3, 2011                    s/ Noel L. Hillman

At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

28